(No. 35122.—

ALONZO GREEN *et al.*, Appellants, *vs.* JESSE WALLER *et al.*, Appellees.

*Opinion filed September 24, 1959—Rehearing denied Nov. 16, 1959.*

PRESCOTT, BURROUGHS, TAYLOR & CAREY, of Chicago, (A. M. BURROUGHS, of counsel,) for appellants.

McCoy, MING & LEIGHTON, of Chicago, (GEORGE N. LEIGHTON, of counsel,) for certain appellees, and SPANGLER & GREENBERG, of Chicago, (ERWIN H. GREENBERG, of counsel,) for other appellees.

Mr. JUSTICE DAILY delivered the opinion of the court:

On February 28, 1951, the plaintiffs, Alonzo Green and Marjorie Green, filed this action in the superior court of Cook County against the defendants, Jesse Waller, Jewel Waller, and Negro Welfare & Social Workers League of America, to declare a trust of a two-flat building located at 6611 South Maryland Avenue, Chicago, and to enjoin the Wallers from enforcing a forcible entry judgment for possession of the premises which had previously issued against the plaintiffs in the municipal court of Chicago. Frank Urbach and Genevieve Urbach, subsequent purchasers of the property, were later added as parties defendant. After prolonged hearings before a master in chancery, a decree was entered by the superior court denying the Greens' claim of interest and ordering their removal from the property. Plaintiffs now appeal and, since a freehold is involved, the jurisdiction of this court has been properly invoked.

The property in question was purchased by Jesse Waller on December 4, 1947, for the sum of $14,500 and was duly registered with the Cook County registrar of deeds under the Torrens Act. (Ill. Rev. Stat. 1947, chap. 30, pars. 45 to 147, incl.) Although there is conflicting evidence as to the underlying arrangements, it is admitted that during 1948 the Negro Welfare & Social Workers League of America advertised the property as first prize in a city-wide raffle conducted by it for certain specified charities and occupied a part thereof as a temporary raffle office. At the raffle drawing, which was held in October, 1948, the plaintiffs produced the winning ticket and thereafter moved into the first floor apartment and collected rents from the other tenants which were in turn delivered to either Jesse Waller or his representative. This arrangement continued for some time but in January, 1951, Waller demanded possession and commenced a forcible entry and detainer action in the municipal court of Chicago to enforce his demand.

A judgment for possession was entered but following the filing of the present suit in the superior court, the judgment was vacated and Waller was temporarily enjoined from further prosecuting the municipal court action, and the latter was subsequently transferred to the superior court and consolidated with the present case. Hearings were thereafter held before a master in chancery, who rendered an initial report on May 20, 1954, in which he recommended that no relief be granted to plaintiffs because of the illegal nature of the lottery transaction.

Meantime, however, on May 15, 1954, the defendants executed a new mortgage upon the premises for the principal sum of $8,000 and thereafter commenced negotiations for sale of the property to Frank and Genevieve Urbach. As a result the property was first conveyed by the Wallers to La Salle National Bank under a trust agreement dated May 31, 1955, and then conveyed by the bank to the defendants Urbach on June 6, 1955. The selling price was $17,000, of which $4,000 was paid to Waller in cash, $7,382.59 represented the first mortgage assumed by the buyers, and the balance was secured by a note and second mortgage given by Urbach upon the premises. The trust deed to the La Salle National Bank was duly registered on May 31, 1955, and following the conveyance to the Urbachs, a certificate of title was issued by the registrar of titles on June 8, 1955, showing them to be the owners of the property. At no time prior to the latter date was any memorial or affidavit filed with the registrar which would indicate that the plaintiffs claimed an interest in the real estate and were contesting Waller's title.

Immediately after purchasing the property, the Urbachs instituted another forcible entry action in the municipal court of Chicago to remove the plaintiffs from the premises and received a judgment for possession. Plaintiffs, however, appealed the cause to the Appellate Court for the First District, which decided, solely upon the pleading, that a serious

title contest existed which could not be tried in a forcible entry suit. The cause was reversed and remanded to the municipal court with instructions to transfer the case to the superior court and also consolidate it with the present action.

On June 21, 1956, defendants, Frank Urbach and Genevieve Urbach, were made parties to this suit and the consolidated causes proceeded to further hearings before the master who filed a supplemental report on June 17, 1958, recommending the dismissal of the plaintiffs' suit and the award of possession to the Urbachs. After disposing of various exceptions, the superior court on July 30, 1958, entered a decree in accordance with the master's recommendations.

At the hearings before the master, the plaintiff Alonzo Green told of winning the raffle, of receiving a key to the house from Waller, and of moving into the premises. According to his account, Waller approached him after the raffle and told him there was some $7,000 to $8,000 owed upon the property, and promised that if Green would pay such obligation to Waller at the rate of $100 per month, the building would then belong to Green. At that time the rentals from other tenants upon the premises amounted to approximately $100 each month, so, allegedly in accordance with his understanding, Green collected the rents and turned them over to Waller or his representative from January, 1949, until some time after the present litigation commenced. Green also related that he maintained the premises with certain rent moneys he had collected, did the janitor work, and generally took care of the place. He admitted, however, that until their difficulties arose he had never demanded a deed to the property from Waller or received a receipt for the $100 payments, that he had never paid the real-estate taxes, that Waller and he were related by marriage and had known each other for about 15 years, and that Waller had on occasions both loaned him money and given him furniture. He also spoke of

attempts by Waller to sell the property and told of seeing the Urbachs and Waller in the building in April, 1955.

Jesse Waller testified that he had never entered into any agreement with the Negro Welfare & Social Workers League relative to the sale of the property but had merely told them, along with other prospective buyers, that he would take $16,000 for the real estate. He further stated that even though he knew his building was being raffled, he did nothing to prevent it but in fact purchased some raffle tickets himself. Although he denied having any connection with the raffle itself, he admitted that as cash was received by the League from their ticket sales he would take the cash from them and issue checks in payment of the raffle expenses. As to Green's possession, he explained that the plaintiff moved in as his agent to collect the rents, take care of the premises, and generally perform the managerial duties connected with such an establishment in exchange for receiving rent-free lodging but without any agreement whatsoever concerning transfer of title to the plaintiffs. Finally, he told of meeting the Urbachs at the premises prior to their purchase and of their being shown around by the Greens, but insisted that neither he nor the Greens told the Urbachs of the pending suit.

According to Steward Brown, an officer of the League and business associate of Jesse Waller, the latter purchased the property with the intention of allowing it to be raffled by the League and of receiving $16,000 from the ticket sales as compensation therefor. Furthermore, as a part of this arrangement, cash receipts were to be paid to Waller as they were received and he in turn would issue his own checks in payment of raffle expenses. As it developed, however, the venture was not a financial success, and although some $9,000 was received from the ticket sales, the expenses other than the real-estate purchase price totalled some $14,000.

Loring Moore, the Waller attorney, testified concerning the sale to Frank and Genevieve Urbach. As he recalled, when the sale became imminent the property was conveyed to the La Salle National Bank under a trust agreement naming the Wallers as beneficiaries. At the closing in Moore's office, on June 6, 1955, a memorandum was prepared which, in addition to setting out the terms of sale, recited that a portion of the premises were occupied by the Greens "not now in lawful possession," that sellers should deposit $500 to be utilized if necessary to cover the costs of "obtaining possession of the premises," that sellers would guarantee rent payments from the first apartment of $75 per month for a period of sixty days, and that Daniel J. Faulkner, a real-estate broker, had been authorized by buyers to take necessary action to obtain possession of the property. Although all parties present expressed satisfaction with the memorandum provisions, it was never actually signed by either party. Moore also said that a total of $4,000 cash was paid by the buyers at the time of closing, that the buyers assumed an existing mortgage and, in addition thereto, gave a note and second mortgage which was not registered. He denied that he had ever apprised the Urbachs, or their agents, of the Greens' claim of ownership or of the present court proceedings.

Daniel J. Faulkner, the real-estate broker who represented the Urbachs in this matter, told of the closing in Loring Moore's office at which the buyers, Waller, and Herbert Dawes (another broker) were also present. According to his account, he was retained by the buyers in the spring of 1955 to look into the possible purchase of the Maryland Avenue property. He talked with Waller and his attorney on various occasions prior to sale but at no time was he informed, or did he know, that Green was claiming an interest in the property, and prior to the closing date Faulkner examined Waller's certificate of title and

found no memorial thereof concerning the Green claim. In fact, as this witness related, the first time he ever knew of such a claim was upon hearing of the Urbach forcible entry and detainer action.

Herbert Dawes, the real-estate broker who sold the property for Jesse Waller, described how he and Waller had shown the Urbachs through the property in the Greens' presence without any claim of ownership being mentioned, how various contracts of sale were submitted before one was actually agreed upon by the parties, and how the deal was finally closed in June, 1955. He swore that he had not known about the Greens' claim until long after the transaction was terminated and that no mention of it was made at the closing.

Genevieve Urbach, one of the buyers, also testified concerning the inspection of the property in May, 1955, and the subsequent real-estate closing. She stated that neither she nor her husband had knowledge of the Greens' claim but understood they were only month-to-month tenants. However, upon being advised of the facts some time after the transaction was terminated, the Urbachs refused to make any further payments upon either the first or second mortgage. She further related that in addition to the Green controversy, it was also necessary for them to file a forcible entry action against a second tenant in the building. Frank Urbach verified the above account and reiterated that he had never been informed of the Green claim until some two months after he had purchased the property.

Plaintiffs contend that the lower court erred in refusing to grant them the relief prayed for in their complaint. They argue that only the State's Attorney can forfeit a lottery prize, that besides winning the raffle they also furnished additional consideration for the property by making regular $100 payments to Waller under an alleged verbal agreement for sale, and that the sale to Urbach was not a *bona fide* transaction but only a device to circumvent the plaintiffs'

interest. The defendants, on the other hand, insist that plaintiffs have never acquired an interest in the property by lottery or otherwise and that the Urbachs, the present owners, are protected as *bona fide* purchasers of a registered title.

There is no doubt that the raffle herein constituted a lottery within the meaning of our Criminal Code and was therefore unlawful. (Ill. Rev. Stat. 1947, chap. 38, par. 406.) Since it is clear that Waller aided in the commission of such activity and that the plaintiffs' possession originated therefrom, this court would be disposed, as between those individuals, to invoke the equitable principle of unclean hands and deny relief to either party. (*Plenderleith* v. *Glos,* 329 Ill. 382; *Mills* v. *Susanka,* 394 Ill. 439; *Neustadt* v. *Hall,* 58 Ill. 172; *Carolene Products Co.* v. *Evaporated Milk Ass'n,* (7th Cir.) 93 F.2d 202; 7 I.L.P., Chancery, sec. 93.) However, here we are also concerned with the rights, if any, which were acquired by third parties, Frank and Genevieve Urbach, as purchasers of the Waller interest and the present holders of the certificate of title.

Section 42 of the Torrens Act (Ill. Rev. Stat. 1953, chap. 30, par. 86) provides that except in case of fraud no person taking a transfer of registered land from the registered owner shall be affected with notice, actual or constructive, of any unregistered trust, lien, claim, demand or interest and that even the actual knowledge of such unregistered interest shall not of itself be imputed as fraud. Section 40 of the same act (Ill. Rev. Stat. 1953, chap. 30, par. 84) also states that the registered owner of any estate or interest in land, except in cases of fraud to which he is a party or of the person through whom he claims without valuable consideration paid in good faith, shall hold the same free and clear of all unregistered claims, liens, and interests other than certain taxes, assessments, and other rights noted therein. The act further provides, in section 84, that "No civil action for any purpose whatever affecting

registered land or any estate or interest therein, or any charge upon the same, shall be deemed to be lis pendens or notice to any person dealing with the same, until a certificate of the pendency of such civil action under the hand and official seal of the clerk of the court in which it is pending, shall be filed with the registrar and a memorial thereof entered by him upon the register of the last certificate of title to be affected." (Ill. Rev. Stat. 1953, chap. 30, par. 121.) Other sections reiterate this principle (Ill. Rev. Stat. 1953, chap. 30, par. 110) and provide for the filing of an affidavit of claim where no other means of registration exists. Ill. Rev. Stat. 1953, chap. 30, par. 129.

The property in question was first registered under the Torrens Act in 1921; a certificate of title was issued to Waller's predecessor in title in 1942; and Waller's certificate was issued in 1947. Despite these facts and the voluminous litigation which developed between the parties from 1951 until the date of Urbach's purchase in 1955, plaintiffs made no attempt whatsoever to comply with the registration requirements and thus protect their claim of ownership. The general purpose of the Torrens Act is to provide a system of registration whereby an intending purchaser of land may determine the condition of the title from a single register and no other. (*People* v. *Mortenson,* 404 Ill. 107; *Miller* v. *Frederick's Brewing Co.* 405 Ill. 591.) By failing to adhere to the statutory requirements, plaintiffs here created the very situation which the act was designed to prevent.

Plaintiffs, in an apparent effort to avoid the consequences of the failure to register their own claim to title, urge that the conveyance from Waller to the Urbachs was a fraudulent transaction designed solely to destroy plaintiffs' interest and that, because of such fraud, the parties to the transaction must be denied the protection of the Torrens Act. Fraud arises, it is claimed, from the circumstances in the record which show that a written memorandum of the parties took

cognizance of plaintiffs' possession, that the contract of sale was never executed by Waller, that the Urbach mortgage was never registered, and from the further circumstance that the Urbachs failed to continue payments upon the first and second mortgages after September 1, 1955.

We find no merit to the contention made. While it is true that memorandum relied upon mentioned the Greens' occupancy, provided a fund for obtaining possession by legal process and guaranteed 60-day rental payments from the apartment occupied by plaintiffs, such circumstances give no rise to a claim of fraud. Section 42 of the Torrens Act, (Ill. Rev. Stat. 1953, chap. 30, par. 86,) after first providing that a purchaser from a registered owner shall not be "affected with notice, *actual or constructive,* of any unregistered trust, lien, claim, demand or interest," further ordains that *"the knowledge of any unregistered trust, lien, claim, demand or interest is in existence shall not of itself be imputed as fraud."* (Emphasis supplied.) In the face of the statute, therefore, the mere knowledge of plaintiffs' possession reflected by the written memorandum does not lend itself to a conclusion that the parties were pursuing a fraudulent purpose.

It is also true that the contract of sale was never executed by the sellers and the second mortgage was never registered. Nevertheless, the sale was actually consummated pursuant to such contract, and the buyers' obligations under the second mortgage do exist and are enforceable even though not presently registered against the property. Although the lack of formality may be ill-advised from a legal standpoint, it does not alter the obligations which were created by the agreements, and certainly does not of itself indicate fraud.

Neither do we believe it unusual that the buyers ceased making mortgage payments in September, 1955. The undisputed evidence shows they were without knowledge of the Green claim until some two months after the closing

in June, 1955. When such knowledge was acquired it would be only natural that they might be reluctant to invest further money in the property until the litigation was settled. Rather than indicating a fraudulent transaction, it is our opinion that such conduct further illustrates the good faith of the buyers throughout the transaction, as do the facts showing that the property was inspected and that negotiations prevailed for some time prior to closing. Were this a mere sham transaction, it is doubtful whether these preliminaries would have occurred. Although it may well be that the Wallers were guilty of improper conduct, such circumstance does not preclude the Urbachs, as *bona fide* purchasers, from invoking the protection afforded by our registration statute. (*Eliason* v. *Wilborn,* 335 Ill. 352; *Singer* v. *Murphy,* 338 Ill. 620.) Since both the master's report and the decree of the superior court contained express findings that the Urbachs did not learn of the Green claim until after they had filed eviction proceedings against the plaintiffs, it is evident that the master and the chancellor, after examining the witnesses and hearing the arguments of counsel, were also convinced of the buyers' good faith. Such being the case, we are not disposed to alter those findings upon the facts at hand. We hold therefore that the lower court did not err in dismissing plaintiffs' complaint and in granting possession to the Urbachs under the consolidated forcible entry and detainer proceeding. Although many other points for reversal have been advanced by plaintiffs in their brief, they have not been argued and are therefore waived. Ill. Rev. Stat. 1957, chap. 110, par. 101.39.

For the reasons stated, the decree of the superior court of Cook County is affirmed.

*Decree affirmed.*