ST. PAUL FEDERAL BANK FOR SAVINGS, Plaintiff-Appellee, v. ELI V. WESBY *et al.*, Defendants (Board of Managers of 3600 Condominium Association, Defendant-Appellant).—CITY CONSUMER SERVICES, INC., Plaintiff, v. ELI V. WESBY *et al.*, Defendants.

First District (2nd Division)   No. 85—2447

Opinion filed October 28, 1986.—Rehearing denied January 6, 1987.

Marshall N. Dickler, Ltd., of Arlington Heights (Marshall N. Dickler, Dawn M. Langer, and Nancy R. Cass, of counsel), for appellant.

Righeimer, Martin, Bridewell & Cinquino, P.C, of Chicago (Frank R. Martin and Elizabeth McGrail, of counsel), for appellee.

JUSTICE SCARIANO delivered the opinion of the court:

Appellant, 3600 Condominium Associates, appeals from the denial of its motion to reconsider entry of summary judgment giving St. Paul Federal Bank for Savings (St. Paul) and City Consumer Services, Inc. (City Consumer), first and second priorities, respectively, over the proceeds of a foreclosure sale of Unit 615 at 3600 North Lake Shore Drive in Chicago. We affirm.

On November 23, 1977, appellant, an Illinois condominium association, registered its declaration of condominium ownership (declaration) and bylaws with the office of registrar of titles for Cook County. Subsequently, Eli Wesby purchased Unit 615 at 3600 Lake Shore Drive, Chicago, and granted St. Paul a first mortgage on the property to secure his note in the principal sum of $41,500, plus interest. St. Paul's first mortgage was registered with the Cook County registrar of titles on July 26, 1978. Later, City Consumer was given a mortgage on the same property, which was registered on September 2, 1982. It is undisputed that St. Paul's first mortgage is prior and superior to City Consumer's second mortgage.

St. Paul filed a complaint to foreclose its first-mortgage lien on

July 30, 1984, and City Consumer filed a complaint to foreclose its second-mortgage lien on August 14, 1984. Appellant was joined as party defendant in both cases, and the two proceedings were consolidated on September 10, 1984. Wesby did not file an appearance and the delinquencies were not controverted; however, appellant filed an answer and counterclaim as to both foreclosure complaints on September 19, 1984, in which it first asserted a claim for unpaid assessments for common expenses. Appellant stated that these annual assessments and other charges became payable each month. Appellant later filed an "Affidavit in Support of Assessments," in which its on-site manager stated that from September 1, 1983, to July 30, 1984, there was due and owing $4,493.63 in common expenses from Unit 615, but that by the date of the affidavit, March 6, 1985, $7,055 was owing. On November 9, 1984, appellant registered its lien arising from these assessments with the Cook County registrar of titles.

St. Paul moved for summary judgment on appellant's counterclaim and on City Consumer's motion for finding on the priorities of liens. After a hearing, the court entered separate orders on March 20, 1985, (1) granting St. Paul's motion for summary judgment, and (2) holding that City Consumer's lien was prior to appellant's and ordering that proceeds from any judicial sale be distributed as follows:

    (a) to the sheriff to cover costs;

    (b) to St. Paul;

    (c) to City Consumer; and

    (d) to appellant.

On the same day, a judgment of foreclosure and sale was also entered. The court held that Wesby owed St. Paul $45,869.81 due on the note and mortgage, plus $2,972.68 in title charges, costs of suit, and attorney fees for a total judgment of $48,842.49. The court also entered judgment in favor of City Consumer for $23,018.89, and for appellant in the total amount of $10,957.81. Pursuant to this judgment, the Cook County sheriff held a sale of the property on May 1, 1985, and St. Paul was the successful bidder. Appellant filed a motion for reconsideration of the "rulings and orders of March 20, 1985." After oral argument the circuit court denied the motion by order entered July 17, 1985. Appellant filed a timely notice of appeal. Appellee City Consumer has not filed a brief in this court.

■■ Appellant first argues that its declaration and bylaws, filed with the registrar of titles on November 23, 1977—before Mr. Wesby purchased Unit 615 or executed any mortgages thereon—constitutes a covenant running with the land, and that St. Paul and City Consumer, as mortgagees, took their interest in the property subject to these in-

struments. We agree. In *Streams Sports Club, Ltd. v. Richmond* (1982), 109 Ill. App. 3d 689, 692, 440 N.E.2d 1264, 1266-67, *aff'd* (1983), 99 Ill. 2d 182, 457 N.E.2d 1226, the Second District held that a lien not provided for in the Condominium Property Act (Ill. Rev. Stat. 1985, ch. 30, pars. 301 through 331), may be created by agreement of the parties and enforced by the courts. In *Streams* the plaintiff, a sports club, brought an action against a condominium owner because she refused to pay annual dues for recreational facilities adjacent to the condominium complex. Our supreme court affirmed the appellate court's decision for the plaintiff, holding that the recorded covenant to pay dues to the sports club was an enforceable covenant running with the land rather than a personal covenant. (*Streams Sports Club, Ltd. v. Richmond* (1983), 99 Ill. 2d 182, 187-91, 457 N.E.2d 1226, 1230-31.) The court applied the test stated in *Neponsit Property Owners' Association, Inc. v. Emigrant Industrial Savings Bank* (1938), 278 N.Y. 248, 15 N.E.2d 793, that for a covenant to run with the land three criteria must be satisfied: (1) the grantor and grantee must have intended that the covenant run with the land; (2) the covenant must touch and concern the land; and (3) there must be privity of estate between the party claiming the benefit of the covenant and the party resting under its burden. *Streams Sports Club, Ltd. v. Richmond* (1983), 99 Ill. 2d 182, 188, 457 N.E.2d 1226, 1230.

■■■ Covenants should be interpreted to give effect to the intent of the parties, and the preamble to the declaration is evidence of such intent. (*Kessler v. Palmeri* (1972), 3 Ill. App. 3d 901, 904-05, 278 N.E.2d 813, 816.) The preamble of the declaration in this case states that the grantor intends that the unit owners, mortgagees, and all other persons acquiring any interest in the property covered by the declaration shall enjoy the benefits of and hold their interests subject to the rights, easements, privileges, and restrictions set forth therein. In addition, paragraph 26 of the declaration states:

> "Each grantee of the Trustee, by the acceptance of a deed of conveyance, and each purchaser under any contract for such deed of conveyance, and any other transferee, accepts the same subject to all restrictions, *** liens and charges *** created or reserved by this Declaration, *and all rights *** hereby imposed shall be deemed and taken to be covenants running with the land,* and shall bind any person having at any time any interest or estate in said land." (Emphasis added.)

This is similar to language in the covenant in *Streams* manifesting an intent that the covenant run with the land. *Streams Sports Club, Ltd.*

*v. Richmond* (1983), 99 Ill. 2d 182, 188-89, 457 N.E.2d 1226, 1230.

■ In *Streams* our supreme court concluded that assessments for condominium recreational facilities, that were adjacent to the condominium units and used by the residents, touched and concerned the land. In the present case the argument that the assessments touch and concern the land is even stronger because the assessments are, in part, for repair of common areas, which clearly furthers the use and enjoyment of the property. *Cf. Lakeland Property Owners Association v. Larson* (1984), 121 Ill. App. 3d 805, 811-12, 459 N.E.2d 1165, 1169-70; *Parrish v. City of Carbondale* (1978), 61 Ill. App. 3d 500, 504-05, 378 N.E.2d 243, 247.

■ Finally, there is privity of estate in this case—that is, a chain of privity between the original covenantee, covenantor, and the subsequent parties to be bound by the covenant. It does not matter that such a connection involves transfer of less than full title, such as a mortgage interest. (See 14 Ill. L. & Prac. *Covenants* sec. 5, at 430 (1968).) In the present case St. Paul and City Consumer both took their interests from Wesby, who was either the original covenantor or a successor to the original covenantor.

■ St. Paul's mortgage specifically describes the mortgaged property as: "Unit No. 615 *** as delineated on Survey of Lot 4 *** together with an undivided .237% interest in the property described in said Declaration of Condominium Ownership aforesaid." City Consumer's description similarly cites the description in the declaration. In *City National Bank v. Home Federal Savings & Loan Association* (Fla. App. 1978), 356 So. 2d 814, the Florida District Court of Appeals held that a mortgage that expressly incorporated a description of the encumbered property contained in the recorded declaration incorporated the other terms of that declaration by implication. Moreover, it is well settled that an assignor, such as Wesby, cannot give away more than he or she has (*Montgomery Ward & Co. v. Wetzel* (1981), 98 Ill. App. 3d 243, 248-49, 423 N.E.2d 1170, 1175-76), and, therefore, we conclude that St. Paul and City Consumer took their mortgage interests from Wesby subject to the terms of the declaration, which bound Wesby.

Having concluded that St. Paul and City Consumer are bound by the declaration and bylaws, we must now construe these documents. Paragraph 11 of the declaration provides in relevant part:

> "11. Common Expenses. Each Unit Owner shall pay his proportionate share of the Common Expenses *** in the same ratio as his percentage of ownership in the Common Elements *** in such amounts and at such times as determined in the manner

provided in the By-Laws. If any Unit Owner shall fail or refuse to make any such payment *** *when due, the amount thereon shall constitute a lien* on the interest of such Unit Owner in the Property as provided in the [Condominium Property] Act and in paragraph 21 hereof; *provided, however, that such lien shall be subordinate to the lien of a prior recorded first mortgage on the interest of such Unit Owner* *** *owned or held by a bank* *** *except for the amount* of the proportionate share of Common Expenses which become *due and payable* from and *after the date* on which the said *mortgage owner or holder* *** *files suit to foreclose* its mortgage." (Emphasis added.)

In addition, article IV, section 7, of the bylaws, which were apparently not registered, recites this identical language and adds:

"Section 7. Lien. *** The Board or Association shall have the right to possession of such Unit [and] authority to exercise and enforce any and all rights and remedies as provided for in the [Condominium Property] Act, the Forcible Entry and Detainer Act, the Condominium Instruments, or which may be available at law or in equity, for the collection of all unpaid assessments." (Emphasis added.)

Paragraph 21 of the declaration lists the remedies for *default* referred to in article IV, section 7, of the bylaws and adds actions for appointment of a receiver, for specific performance, and for right to take possession and rent or sell the unit or for any combination of the foregoing. The paragraph goes on to state:

"All expenses of the Association in connection with any actions or proceedings described herein, including court costs and attorneys' fees and all other expenses of the proceeding and sale, and all damages, liquidated or otherwise, together with interest thereon at the rate of 8% per annum until paid, shall be charged to and assessed against *such defaulting Unit Owner*, and shall be added to and deemed part of his respective share of the Common Expenses, *and the Association shall have a lien for all of the same, as well as for non-payment of his respective share of Common Expenses upon the Unit* and ownership interest in the *Common Elements* of such *defaulting Unit Owner* and upon all of his *additions and improvements* thereto and upon all his *personal property* located in his Unit or elsewhere on the Property. *In the event of any such default* by any Unit Owner, the Association *** shall have the authority to correct such default and to do whatever may be necessary for such purpose, and all expenses in connection therewith shall be

charged to and assessed against *such defaulting Unit Owner, and such assessment shall constitute a lien upon the interest of such defaulting Unit Owner in the Property, his additions and improvements thereto, and upon all of his personal property located in his Unit or elsewhere on the Property."* (Emphasis added.)

Paragraph 11 of the declaration expressly subordinates appellant's lien for any common expenses incurred before the filing of the foreclosure action to a first-mortgage lien. Appellant therefore concedes that St. Paul's first-mortgage lien has priority from the date of its registration until the date St. Paul filed its complaint to foreclose, and claims priority only for the condominium assessments falling due after St. Paul filed its foreclosure suit.[1]

■ On the other hand, appellant does seek priority over City Consumer's entire second-mortgage interest. Appellant first argues that this court should reverse the circuit court's decision as to City Consumer because City Consumer has failed to file a brief on appeal. However, such a reversal is generally unwarranted unless the appellant makes at least a *prima facie* showing of reversible error supported by the record. *First Capitol Mortgage Corp. v. Talandis Construction Corp.* (1976), 63 Ill. 2d 128, 133, 345 N.E.2d 493, 495.

■ The general rule under the common law is that lien priorities are determined by the order of attachment. (59 C.J.S. *Mortgages* sec. 214 (1949).) The common law rule has been modified, however, by the Illinois legislature. The conveyances statute provides that lien and mortgage priorities are determined by order of recordation of the lien or mortgage. (See Ill. Rev. Stat. 1985, ch. 30, pars. 29, 37a.) In addition, "An Act concerning land titles" (the Torrens Act) (Ill. Rev. Stat. 1985, ch. 30, pars. 45 through 148) provides an alternative system in which a deed or mortgage:

> "does not directly affect the title to registered land, but affects it only by way of contract between the parties constituting authority to the registrar to register the transfer or mortgage." (*People v. Mortenson* (1949), 404 Ill. 107, 112, 88 N.E.2d 35, 38.)

After receipt of the instrument creating a charge on the realty and the owner's duplicate certificate, the registrar memorializes the

---

[1]The record is unclear as to whether St. Paul's mortgage is a purchase money mortgage (see *In re Application of Busse* (1984), 124 Ill. App. 3d 433, 440, 464 N.E.2d 651, 656; *Bank of Homewood v. Gambella* (1964), 48 Ill. App. 2d 316, 199 N.E.2d 293), and thus we do not consider the effect, if any, such an interest would have on appellant's claim of priority.

charge on the certificate of title, which is kept in a register. (See Ill. Rev. Stat. 1985, ch. 30, pars. 53, 74, 79, 89, 103 through 110.) The certificate filed with the registrar is the sole and exclusive evidence of title, and purchasers take their interests free and clear of all unregistered claims. (*Rosewood Corp. v. Illinois Bell Telephone Co.* (1967), 38 Ill. 2d 29, 230 N.E.2d 172; Ill. Rev. Stat. 1985, ch. 30, pars. 84.1, ·93. See also DeBofsky, *When Good Deeds Go Unrewarded—Recording and Torrens Land Registration*, 65 Chi. B. Rec. 118, 122 (1983) (discussing amendments to the Torrens Act following our supreme court's decisions in *Echols v. Olsen* (1976), 63 Ill. 2d 270, 347 N.E.2d 720 and *8930 South Harlem, Ltd. v. Moore* (1979), 77 Ill. 2d 212, 396 N.E.2d 1).) A purchaser is not affected by actual or constructive knowledge of any unregistered claim, absent his or her own fraud. (*Green v. Waller* (1959), 17 Ill. 2d 392, 161 N.E.2d 858; Ill. Rev. Stat. 1985, ch. 30, pars. 86, 93.) Once land is brought under the Act by registering it with the registrar of titles, it remains subject to the Act until taken out by the procedures set forth in the Act itself. (Ill. Rev. Stat. 1985, ch. 30, par. 90.) Condominium properties may register under the Act (see *La Salle National Bank v. Triumvera Homeowners Association* (1985), 133 Ill. App. 3d 303, 478 N.E.2d 1033), and, afterwards, a single unit owner cannot withdraw from the Act unless all registered units described in the declaration are withdrawn. (Ill. Rev. Stat. 1985, ch. 30, par. 96.6.) As noted above, the condominium property at issue here was registered and thus is subject to the Torrens Act. Indeed, as required, the registrar of titles is made a party to this litigation.

The enactments discussed above affect only the order of priority of liens that have already come into existence. While appellant's declaration was registered before City Consumer's second mortgage, appellant cannot validly claim priority unless its own lien was created and registered earlier. Appellant does not point to any statute or to any provision in the declaration by which registration of its declaration alone could create a "shill" lien that could assume priority over subsequently registered encumbrances; and by a "shill" lien, we mean one in which only the amount remains undetermined. Ordinarily, there is simply no lien by mortgage or otherwise until there is a debt or some obligation to perform an act. *Thorin v. March* (1936), 287 Ill. App. 513, 516, 5 N.E.2d 292, 294 (mortgage); *Bacon v. National German-American Bank* (1901), 191 Ill. 205, 209, 60 N.E. 846, 847 (mortgage); *Hargrove v. Gerill Corp.* (1984), 124 Ill. App. 3d 924, 931-32, 464 N.E.2d 1226, 1231 (equitable lien); *Weiland Tool & Manufacturing Co. v. Whitney* (1963), 40 Ill. App. 2d 70, 94, 188 N.E.2d 756, 767 (lien).

■■■ In determining the nature of appellant's rights in relation to those of conflicting mortgagees, we must look to the express language of the declaration. (*Damen Savings & Loan Association v. Johnson* (1984), 126 Ill. App. 3d 940, 944, 467 N.E.2d 1139, 1141.) Under paragraph 11 of the appellant's declaration, quoted above, the amount of unpaid common expenses constitutes a lien on the owner's property "when due." Thus, appellant had, on the date it registered the declaration, merely a notice that a right to perfect a lien existed. Similarly, paragraph 21 of the declaration provides that the association shall have a lien upon the interest of the "defaulting owner" and that "[i]n the event of such default *** such assessment shall constitute a lien." Once again, nonpayment is required to create the lien. Appellant filed an affidavit in the circuit court supporting its assessment, which stated that "from September 1, 1983 to July 30, 1984, there was due and owing the amount of *** $4,493.62 in common expenses from Unit 615." This indicates that the Wesbys did not fall past due on their monthly payments until September 1, 1983, and under the express terms of the declaration and bylaws appellant did not have a lien until that date. St. Paul's mortgage was registered on July 26, 1978; City Consumer's mortgage was registered on September 2, 1982; therefore they are clearly prior in time to appellant's lien and prior in right.

Nonetheless, appellant notes that a condominium lien is to be foreclosed in the same manner as a mortgage. (See Ill. Rev. Stat. 1985, ch. 30, par. 309(h).) A mortgage is considered perfected upon recordation or registration, as the case may be; and, similarly, appellant argues, its lien must be considered perfected upon registration of the declaration. From the date that the declaration was registered, the association has had an annual budget from which the assessments could be projected and, according to appellant, these future assessments were no less certain than the amount payable to a mortgagee upon recordation or registration of a mortgage. This argument confuses debt, which is necessary to perfect a mortgage, with default, which creates a right to foreclose on a mortgage. The problem in this case is not that the amount of appellant's lien would be difficult to calculate until the fees for common expenses became past due, but rather that, under the express terms of the declaration and bylaws, the lien was not even created until that time. Wesby owed St. Paul a debt when it gave him $41,500 of its own money on or about March 30, 1978, and he owed City Consumer a debt when that mortgagee gave him $15,000 on or about September 22, 1982. That is quite a different thing from appellant's expectancy of repayment for future ex-

penses. It is not clear whether 3600 Lake Shore Drive, or even the city of Chicago, will exist in the year 2525, but appellant's argument implies that its lien for common expenses for that year, and for all of eternity, was created on November 23, 1977, when the declaration was registered.

In addition to the rights provided under the declaration and by-laws, section 9 of the Condominium Property Act gave condominium associations a lien for common expenses, stating in relevant part:

"If any unit owner shall fail or refuse to make any payment of the common expense *when due,* the amount thereof shall constitute a lien on the interest of such unit owner in the property *and upon the recording of notice thereof* by the manager or board of managers *** *it shall be a lien* upon such unit owner's interest in the property *prior to all other liens and encumbrances,* recorded or unrecorded, except only (a) taxes *** (b) encumbrances on the interest of such unit owner *recorded prior to the date such notice is recorded,* which by law would be a lien thereon prior to subsequently recorded encumbrances." (Emphasis added.) (Ill. Rev. Stat. 1983, ch. 30, par. 309.)

Thus, appellant also might have a lien arising under the Condominium Property Act, but, by the terms of the Act, the priority of this lien in relation to other recorded or registered encumbrances is determined by resort to other law. As noted above, the rule otherwise followed is that priority is determined by order of perfection, which in this case means existence of a debt and registration of the lien.

Section 9 of the Condominium Property Act was amended effective August 30, 1984, about the time this suit was filed, but the amended Act is expressly excluded from application to liens existing before its effective date. (Ill. Rev. Stat. 1985, ch. 30, par. 309(k).) The amended version of the Condominium Property Act does, however, provide, with respect to encumbrances executed prior to its effective date, that the board of managers can send by registered mail to such encumbrancer a statement of the amounts and due dates of such unpaid common expenses for the unit, and then such prior recorded encumbrance shall become subject to the lien of all unpaid common expenses which become due and payable within a period of 90 days after the date of mailing the notice. (Ill. Rev. Stat. 1985, ch. 30, par. 309(g)(2).) There is no indication, and appellant does not argue, that it availed itself of this procedure.

The present version of section 9 of the Condominium Property Act appears to eliminate the requirement that the statutory lien

for common expenses be recorded before it can assume priority. It states:

"(g)(1) If any unit owner shall fail or refuse to make any payment of the common expenses *when due,* the amount thereof together with any interest, late charges, reasonable attorney fees and costs of collections or the amount of any unpaid fine *shall constitute a lien* on the interest of such unit owner in the property *prior to all other liens and encumbrances,* recorded or unrecorded, *except only* (a) taxes \*\*\* and (b) *encumbrances* on the interest of such unit owner recorded prior to the date of such failure or refusal *which by law would be a lien thereon prior* to subsequently recorded encumbrances." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 30, par. 309(g)(2).)

The transcript of the House debate shows that the following exchange took place between Representative Cullerton and the House sponsor of the bill:

"Rep. Cullerton: 'Allright. I have one more question. When the Bill removes the requirement for filing the Board of Managers' liens for unpaid assessments, as I understand it, it would automatically arise. Could you explain the reason for that change?'

Rep. Levin: 'Yes. The intent here is to deal with what many in the field consider to be an erroneous interpretation of the existing lien procedures by bankruptcy magistrates. And the situation arises where a unit owner doesn't pay their assessments and then goes into bankruptcy, and the question arises whether or not the association has a preference, has a perfected lien where they have not physically filed a notice of lien. And the intent here is to make clear that they do but, by the same token, that there should be no priority over any other filed liens, simply that there is a perfection, but that it does not supersede a first mortgage or other filings.' " (83rd Ill. Gen. Assem., House Proceedings, June 12, 1984, at 8.)

Under its plain language, the statutory lien is for failure to pay common expenses "when due," and prior recorded mortgages still take priority under the new law, if applicable. St. Paul's mortgage was recorded on July 26, 1978, City Consumer's mortgage was recorded on September 2, 1982, and their liens are superior to that created by section 9 of the Condominium Property Act. The amendment simply makes clear that liens for unpaid assessments are perfected without recording and thereby can take priority over subsequently recorded liens. It is unlikely that this change would affect the requirement that

such liens on property that has been brought under the Torrens Act would have to be registered. We conclude that appellant has failed to make a *prima facie* showing of error entitling it to reversal of the judgment as to City Consumer.

■■ As noted above, appellant concedes that St. Paul's first mortgage takes priority over its lien up until the time that suit to foreclose is filed. In addition, we have just held that City Consumer's prior-recorded second mortgage is superior to appellant's lien. But appellant still asserts that it has priority over the two mortgages as to its lien for unpaid assessments coming due after foreclosure suit was filed. We disagree.

As quoted above, paragraph 11 of the declaration provides that, prior to the filing of a suit to foreclose, the lien for unpaid assessments arises "when due." Moreover, the association, in the same paragraph of the declaration, explicitly subordinates its own lien to that of a prior recorded first mortgage, "except for the amount[s] *** which become due and payable" after the date foreclosure suit is filed. "Which become due" is forward looking and implies creation of a lien for a debt not yet owed, and the "except for" clause could be an attempt to give the association superiority to a prior-recorded first mortgage after foreclosure suit is filed. However, the declaration makes no mention of second and subsequent mortgages, and it does not clearly define the relationship between the first mortgage and the lien for unpaid common expenses incurred after foreclosure suit is filed. Rather, after foreclosure, the instrument simply creates an exception to the first mortgagee's priority that it previously purported to grant. By virtue of the Torrens Act, however, the mortgages held by St. Paul and City Consumer would be superior to appellant's lien anyway.

In this case, applying the settled rule that there is no lien until there is a debt and the unpaid assessments are actually owed creates an anomalous situation under appellant's declaration, in that appellant could never obtain priority because the first and second mortgages are almost universally recorded prior to the time that the mortgagees file suit to foreclose. On the other hand appellant's proposed construction allows for the creation of secret liens. To be sure, the mortgagees take subject to the declaration, which purports to subordinate their mortgages to any lien for unpaid common expenses becoming due after foreclosure. However, under the terms of the declaration, the lien arises only when there is a debt, and appellant did not register its lien until November 1984. While the mortgagee had notice, through the declaration, of the possibility that such a lien for unpaid common ex-

penses after foreclosure suit could arise *in futuro*, appellant provided valid legal notice of the lien only when it registered it. By this time, St. Paul's and City Consumer's mortgage liens were already in existence and registered and thus were superior to appellant's lien for unpaid common expenses.

Under the declaration here considered, the only way that appellant could obtain priority over St. Paul and City Consumer would be if the priority of its subsequently created lien related back to the day it registered its declaration. In support of its position, appellant cites *Bessemer v. Gersten* (Fla. 1980), 381 So. 2d 1344, which held that a lien for unpaid common assessments did relate back to the date the declaration was filed. In that case, petitioners, successors in interest to a subdivision developer, sued to foreclose a lien against the respondents' property for nonpayment of their share of a recreational assessment. Previously, on January 8, 1970, the developer filed a "declaration of restrictions" pertaining to the subdivision, which stated:

> "[E]ach owner hereby agrees that the Behring Corporation, its successors or assigns, shall have a lien upon such owner's lot for the aforesaid amount of $10.00 per month until such amount is paid, and that such lien, where the same remains unpaid for a period of 30 days or more, may be foreclosed in equity in the same manner as is provided for the foreclosure of mortgages on real property." (381 So. 2d 1344, 1346.)

The declaration also provided that the monthly rental charge would commence after recordation of a certificate that construction on the recreational facility had been completed, and that the declaration constituted a covenant running with the land. On November 27, 1970, respondents accepted the deed to their house. A foreclosure suit was filed on December 11, 1975, on a lien for the amount of $52.91 in recreation fees. Respondents claimed that the lien could only arise upon nonpayment and was therefore unenforceable against their property since it came into existence after homestead status was acquired. The Florida Supreme Court disagreed, stating:

> "The respondents do not dispute their promise to pay the recreational facility charge, but argue that there is no enforceable lien. There was no agreement on their part, they contend, manifesting an intent to pledge or charge their property as security for the obligation. The district court held that a lien arose at the time the respondents took title, based on their actual or constructive notice of the lien provision in the declaration of restrictions. The petitioners argue that the lien was cre-

ated by the filing of the declaration of restrictions, that it was in existence as an encumbrance on the property at the time of the conveyance, and that the respondents took title *subject to* the lien. The petitioners argue in the alternative that if, as the district court held, the lien came into existence at the time of the conveyance, its existence relates back to the time of the filing of the declaration of restrictions, so that it attached to the ownership interest prior to the creation of homestead status.

We hold that respondents, in accepting the deed with actual or constructive notice of the lien provision of the declaration of restrictions, manifested the intent to let the real property stand as security for the obligation. An affirmative covenant can be entered into by acceptance of a deed embodying same. Thus a valid contractual lien was created at that time.

We hold further that the creation of the lien by acceptance of the deed relates back to the time of the filing of the declaration of restrictions. Thus, with regard to the time of attachment of the lien, this case is to be treated as if the respondents had taken title subject to a valid pre-existing lien. Since the acquisition of homestead status does not defeat prior liens [citations], the lienor's right prevails over the respondents' homestead right." (Emphasis in original.) (*Bessemer v. Gersten* (Fla. 1980), 381 So. 2d 1344, 1348.)

See also *In re Lincoln* (Bankr. D. Colo. 1983), 30 Bankr. 905, (in which the bankruptcy court stated that it could find no authority contrary to the *Bessemer v. Gersten* decision, and held that the lien of a homeowners association would relate back to the date of filing of the declaration and was therefore valid as prior to the debtor's acquisition of homestead status).

*Bessemer* involved a conflict between a creditor's lien and the debtor's homestead right, and we do not know how the same court would deal with conflicting lien priorities between creditors as is presented here. Nonetheless, we find no language in appellant's declaration that would cause any lien for unpaid common expenses to "relate back" to the date that the declaration was filed. Mortgagees were simply not put on notice by the declaration that the possibility existed of such a relation back. Nor has appellant pointed to any statute that would specifically authorize relation back of such a lien. (*Cf.* Ill. Rev. Stat. 1985, ch. 30, par. 37a.) Indeed it militates against settled principles of law. Elemental fairness requires that people with conflicting claims be given notice.

To hold that priority of such a debt relates back to the date the

declaration is recorded or registered would expose lenders to unknown risks and would undercut the principle, embodied in the recordation and registration statutes, that persons who are about to acquire an interest in land are entitled to know the extent to which that interest is impaired. The typical covenant running with the land, such as the grant of an easement or a promise to maintain a sidewalk, imposes a burden that is known at the time title is transferred. Assessments for expenses, in contrast, are unknown. In this case the amount of assessment is based on the annual budget and unknown common expenses, which are decided by the condominium board, are subject to change and fluctuation, and are something over which a mortgagee has no control. The record indicates that from September 1, 1983, to July 30, 1984, the assessment was $4,493—a very substantial amount. In *Bessemer* the amount of assessment was stated in the declaration itself as a modest $10 per month. It appears manifestly unfair to allow a condominium association to run up huge assessments, and let them go unpaid for years, and then, in effect, assert them against a foreclosing lender when they could go as far as swallowing up the mortgagee's entire interest, which was unimpaired when the mortgage was filed. We decline to extend application of the principles enunciated in *Bessemer v. Gersten* and *In re Lincoln* to this case, but instead adopt the position that, under the express terms of the declaration of the condominium association here presented, the priority of any lien created by Wesby's debt did not relate back to the date that the declaration was recorded and that there is no statute that appears to defeat such priority as between the appellant and the mortgagees herein.

We affirm the judgment of the circuit court.

Affirmed.

STAMOS and HARTMAN, JJ., concur.